**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**CHARLES BARBER,**

                                **Plaintiff,**

      **vs.**                                   **1:14-CV-907
(MAD/TWD)**

**VON ROLL U.S.A., INC.,**

                                **Defendant.**
_____

**APPEARANCES:**                         **OF COUNSEL:**

**TULLY RINCKEY PLLC**          **DAVID A. FALLON, ESQ.**
441 New Karner Road
Albany, New York 12205
Attorneys for Plaintiff

**MCNAMEE, LOCHNER, TITUS &**     **GLEN P. DOHERTY, ESQ.**
**WILLIAMS, P.C.**
677 Broadway, 5th Floor
Albany, New York 12207
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff commenced this action on July 22, 2014, alleging that Defendant violated the

Family and Medical Leave Act of 1993 ("FMLA") by interfering with Plaintiff's attempts to

exercise his rights under the FMLA and by retaliating against Plaintiff for attempting to exercise

those rights, intentionally and negligently inflicted emotional distress on Plaintiff, and retaliated

against Plaintiff in violation of New York Labor Law § 740. *See* Dkt. No. 1. On November 5,

2014, Plaintiff filed an amended complaint, which alleges causes of action based on Defendant's

alleged violations of the FMLA and New York Labor Law § 740 and intentional infliction of

emotional distress. *See* Dkt. No. 12. Presently before the Court is Defendant's motion to dismiss

the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 17. Plaintiff has opposed Defendant's motion. *See* Dkt. No. 19.

## II. BACKGROUND[1]

Defendant employed Plaintiff as a quality control technician in its Schenectady, New York office from in or about 2004 to December 2013. Dkt. No. 12 at ¶ 8. Around 2011, Plaintiff's coworker, Scott Gilligan, began exhibiting erratic and threatening behavior, including threats of physical violence towards his coworkers. *Id.* at ¶ 9. For example, in or about October 2012, Gilligan threatened to slit the throat of Greg Brown, a maintenance worker employed by Defendant. *Id.* at ¶ 10. The next month, Gilligan threatened to stab Defendant's employee Jim Simmons in his neck with a pair of scissors. *Id.* at ¶ 11. In or about February 2013, Gilligan smashed Defendant's work chair, used a detached arm from the chair to smash a dielectric machine, and threw the broken chair across the work room. *Id.* at ¶ 12. Plaintiff reported the chair destruction to his supervisor, Clyde Coppola. *Id.* at ¶ 13. Defendant took no action in response to this report. *Id.*

That same month, Defendant's employee Francisco Monge reported being harassed by Gilligan to Defendant's human resources department. *Id.* at ¶ 14. Upon learning that Monge reported him, Gilligan stated: "[I]f he gets me fired, I'm coming in here guns-a-blazing." *Id.* In or about May 2013, Gilligan threatened to strike Plaintiff in the head with a baseball bat. *Id.* at ¶ 15.

In or about June 2013, Gilligan began displaying a picture at his desk of a "smiley face" with a hole in its head and blood dripping down its face. *Id.* at ¶ 16. He also began displaying a

---

[1] The factual background is derived from the allegations in Plaintiff's amended complaint, which are presumed to be true solely for the purposes of this motion, and the documents attached to the amended complaint as an exhibit. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

sign at his desk that read "DUE TO THE PRICE INCREASE OF AMMUNITION . . . DO NOT EXPECT A WARNING SHOT!  Thank you for your understanding."  *Id.* at ¶ 17.  Plaintiff's supervisors, Tony Brown and Kimball Hubbard, frequently walked by Gilligan's desk and could observe the picture and sign.  *Id.* at ¶¶ 16, 17.  Defendant took no action regarding the picture or sign.  *Id.* at ¶¶ 16, 17.

In or about August 2013, Gilligan sprayed acetone in Simmons' locker drawer.  *Id.* at ¶ 18. Plaintiff and a colleague, John Schmidt, reported this conduct to Defendant's human resources employee Keirsten Dellert Smith.  *Id.*  Defendant took no action in response to this incident.  *Id.*

On or about September 19, 2013, Gilligan threatened to knock out Defendant's employee Tim Chapman's teeth in front of a supervisor.  *Id.* at ¶ 19.  Plaintiff and Chapman reported the threat to Defendant's human resources department.  *Id.*  Defendant took no action.  *Id.* On or about October 4, 2013, Plaintiff and Chapman reported Gilligan's threatening behavior to the Rotterdam Police Department.  *Id.*  Chapman then went out on leave, requested FMLA leave, and was later fired.  *Id.* at ¶ 20.

On Friday, October 11, 2013, Gilligan brought ammunition into the office and displayed it on his desk until the morning of Monday, October 14, 2013.  *Id.* at ¶ 21.  Gilligan had inscribed Plaintiff's initials, "CB," on one of the bullets.  *Id.*  Plaintiff learned of the ammunition and its inscription on October 14, 2013, when two of his coworkers showed him pictures of the bullets. *Id.* at ¶ 22.  The next day, Plaintiff phoned Smith in human resources to report the incident and inquire why he was not informed about it.  *Id.* at ¶ 23.  Smith informed Plaintiff that he was not in danger and that Defendant would not take any action.  *Id.*

After this conversation, Plaintiff began to experience severe anxiety, intense feelings of panic, emotional distress, and fear for his personal safety.  *Id.* at ¶ 24.  On October 16, 2013,

Plaintiff had an appointment with physician's assistant Neal Norton, who diagnosed Plaintiff with an anxiety disorder and directed Plaintiff to remain out of work until October 22, 2013. *Id.* at ¶ 25. The same date, Plaintiff filed a police report with the Rotterdam Police Department regarding the ammunition incident. *Id.* at ¶ 27. An officer from the department visited Defendant's office to investigate the complaint. *Id.* Defendant then terminated Gilligan's employment. *Id.*

Plaintiff stayed out of work from October 16 through October 21. *Id.* at ¶ 26. Plaintiff called Defendant each day that he missed work and provided Defendant with documentation of the medical reason for his absence. *Id.* When he returned to work, Plaintiff was assigned to the "second shift" to cover for Chapman, who was still out on leave. *Id.* at ¶ 28. On October 24, 2013, Plaintiff received a written warning from his supervisor for taking leave from October 16 through October 21. *Id.* at ¶ 29. On October 28, 2013, Plaintiff received a written warning for being absent from work on October 25, 2013 to attend his brother's wedding. *Id.* at ¶ 30. Plaintiff had obtained preapproval from Defendant for this absence. *Id.*

On November 21, 2013, Plaintiff learned from a coworker that Gilligan would be returning to work. *Id.* at ¶ 31. Plaintiff again began experiencing anxiety, panic, fear, and emotional distress. *Id.* He requested information from Defendant's human resources department regarding applying for leave under the FMLA. *Id.* at ¶ 32. Defendant's human resources representative informed Plaintiff that he would not qualify for FMLA leave and provided him with a short term disability claim form. *Id.* On the same date, Plaintiff again sought treatment from Norton. *Id.* at ¶ 33. Norton concluded that Plaintiff's anxiety disorder had worsened and instructed Plaintiff to remain out of work and commence a regimen of prescription anti-anxiety medication. *Id.*

On November 22, Plaintiff faxed a short-term disability claim form completed by Norton to Defendant's human resources office. *Id.* at ¶ 34. The form indicated a diagnosis of anxiety and a treatment plan including "anti-anxiety medication prn" and for Plaintiff to remain "out of work while current situation with coworker mediated." Dkt. No. 12-1 at 4. It further indicated that Plaintiff's recommended return date to work was unknown depending on a resolution of the situation. *Id.*; *see also id.* at 5 ("[C]annot work under current duress until situation mediated, harassment occurring by coworker."). The form also identified the date of Plaintiff's next scheduled office visit as December 5, 2013. *Id.* at 4. Plaintiff returned to Norton's office on December 10, 2013. Dkt. No. 12 at ¶ 36. Upon concluding that Plaintiff's anxiety had not improved, Norton prescribed Barber Alprazolam to treat Plaintiff's anxiety and instructed Plaintiff to remain out of work. *Id.*

From November 25, 2013 through December 12, 2013, Plaintiff called into work each day to indicate that he was unable to work due to his stress and anxiety and referred Defendant to the short term disability form he had submitted. Dkt. No. 12 at ¶ 35. On December 12, 2013, Defendant terminated Plaintiff's employment for missing work on ten consecutive days without a satisfactory explanation. *Id.* at ¶ 37.

Plaintiff's amended complaint alleges four causes of action related to his termination: (1) interference with Plaintiff's attempts to exercise his FMLA rights; (2) retaliation for Plaintiff's attempts to exercise his FMLA rights; (3) intentional infliction of emotional distress; and (4) retaliation for disclosing a violation of law, rule, or regulation that creates and presents a substantial and specific danger to the public health or safety, in violation of New York Labor Law § 740. *See* Dkt. No. 12. Defendant argues that Plaintiff's FMLA and intentional infliction of emotional distress claims must be dismissed as waived pursuant to New York Labor Law §

740(7).  *See* Dkt. No. 17-2 at 11-13.  Defendant further argues that even if not waived, each of

Plaintiff's claims is subject to dismissal for failure to state a claim upon which relief may be

granted.  *See id.* at 14-31.

## III. DISCUSSION

### A.    Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief and pleadings

without considering the substantive merits of the case.  *See Global Network Commc'ns, Inc. v.*

*City of New York*, 458 F.3d 150, 155 (2d Cir. 2006).  In considering the legal sufficiency, a court

must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the

pleader's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)

(citation omitted).  This presumption of truth, however, does not extend to legal conclusions.  *See*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the

claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled

to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quoting Fed R. Civ. P.

8(a)(2)).  Under this standard, the pleading's "[f]actual allegations must be enough to raise a right

of relief above the speculative level," *Twombly*, 550 U.S. at 555, and present claims that are

"plausible on [their] face," *id.* at 570.  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between possibility and

plausibility of "entitlement to relief."'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately,

"when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed," *id.* at 570.

## B.    Waiver Under New York Labor Law § 740(7)

Defendant first argues that by asserting a claim under Section 740 of the New York Labor Law, Plaintiff waived "all other claims that arise out of the same facts as the Section 740 claim, or that relate to the retaliatory actions upon which his Section 740 claim is based." Dkt. No. 17-2 at 11.  Plaintiff contends that the waiver provision of Section 740 is more narrow than Defendant suggests and applies only to claims asserting rights and remedies related to whistleblowing.  *See* Dkt. No. 19-1 at 10-11.  Plaintiff therefore argues that his FMLA and intentional infliction of emotional distress claims are not waived because they involve different rights than those protected by Section 740.  *See id.* at 11-12.  Plaintiff further argues that even if Defendant's reading of Section 740's waiver provision is correct, his FMLA and intentional infliction of emotional distress claims arise out of different factual allegations than his Section 740 claim and are therefore not waived.  *See id.* at 12.

Section 740 of the New York Labor Law — New York's Whistleblower Act — prohibits employers from taking retaliatory personnel action against an employee based on the employee's disclosure of certain employer violations of laws, rules, or regulations.  *See* N.Y. Lab. Law § 740(2).  The statute provides an enforcement mechanism in the form of a civil action for certain damages and injunctive relief.  *See id.* § 740(4)-(5).  Section 740 also contains an election of remedies provision, which reads as follows:

> Existing rights.  Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any other law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in

> accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule or regulation or under the common law.

*Id.* § 740(7).

The exact scope of Section 740's waiver provision has not yet been addressed by either the Second Circuit or the New York Court of Appeals. In *Reddington v. Staten Island University Hospital*, 511 F.3d 126, 134 (2d Cir. 2007), the Second Circuit noted the apparent contradiction between Section 740(7)'s instruction that the statute should not be read as diminishing an employee's otherwise available legal rights and its provision that instituting an action under the statute shall waive the rights and remedies available to the employee under any other law. The Second Circuit further noted:

> Responding to this apparent incongruity, courts have adopted differing and sometimes contradictory limiting constructions of this waiver. New York state courts have generally held that the waiver applies to all causes of action that relate to the retaliatory discharge, which may include contract claims, tort claims, and claims arising under state antidiscrimination laws. Federal district courts, in contrast, generally interpret the waiver as applying "only to rights and remedies concerning whistleblowing," and therefore deem it not to apply, for example, to claims of employment discrimination. Additionally, federal courts have interpreted the provision not to waive or otherwise affect rights arising under federal law.

*Id.* (internal citations omitted). Although the Second Circuit then certified a question to the New York Court of Appeals regarding the scope of the Section 740 waiver provision, *see id.* at 136, the Court of Appeals resolved the question with the narrow determination that instituting a suit under Section 740 did not waive a plaintiff's claim under New York Labor Law § 741, enforceable only through Section 740(4), *see Reddington v. Staten Island Univ. Hosp.*, 11 N.Y.3d 80, 88-89 (2008). Neither court has addressed the Section 740 waiver provision since, and this Court is

bereft of binding authority on the proper interpretation of the provision. *See Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967) (noting that lower state court decisions are not controlling as to federal courts where the state's highest court has not spoken on a legal issue).

As the Second Circuit noted in *Reddington*, many lower New York State courts have adopted the position urged by Defendant that Section 740's waiver provision bars all causes of action related to the complained-of retaliatory discharge. *See* 511 F.3d at 134 (citing *Hayes v. State Island Univ. Hosp.*, 39 A.D.3d 593, 593-94 (2nd Dep't 2007); *Bordan v. North Shore Univ. Hosp.*, 275 A.D. 335, 336 (2nd Dep't 2000); *Pipas v. Syracuse Home Ass'n*, 226 A.D.2d 1097, 1097 (4th Dep't 1996); *Owitz v. Beth Israel Med. Cent.*, 2004 WL 258087, *3 (N.Y. Sup. Ct. Jan. 29, 2004)). Even Defendant's broader proposed reading of the waiver provision, whereby all claims arising out of the same facts as those underlying the Section 740 claim are waived, finds support in certain lower New York State and federal district court decisions. *See, e.g.*, *Nadkarni v. North Shore-Long Island Jewish Health Sys.*, No. 02-CV-05872-JS, 2003 WL 24243918, *6-7 (E.D.N.Y. July 31, 2003) (dismissing the plaintiff's claims under the Americans with Disabilities Act and New York State Human Rights Law and refusing to permit the plaintiff to amend her complaint to add a FMLA claim because "[t]he facts surrounding her claims . . . are the exact same facts as those surrounding her claim for relief pursuant to [Section 740]" and were therefore waived); *Feinman v. Morgan Stanley Dean Witter*, 193 Misc. 2d 496, 497 (N.Y. Sup. Ct. 2002) ("[S]ubsection [740(7)] . . . bars claims which arise out of the same facts as give rise to the claims brought under section 740(2). Thus, if, as defendants argue, plaintiff's first cause of action alleges that he was discharged in violation of Labor Law section 740(2), his second cause of action, which is based upon the same discharge, is barred by section 740(7)." (internal citation omitted)). In addition, Defendant is correct that at least one district court within the Second Circuit has

found the Section 740 waiver provision to waive rights arising under federal law including the Americans with Disabilities Act and FMLA where those claims relied on the same facts as the plaintiff's whisteblower claim.  *See Nadkarni*, 2003 WL 24243918 at *7.[2]

However, this Court agrees with the well-reasoned opinion of Judge Lynch in *Collette v. St. Luke's Roosevelt Hospital*, 132 F. Supp. 2d 256 (S.D.N.Y. 2001), and Judge Lynch's conclusion that the Section 740 waiver provision "applies only to rights and remedies concerning whistleblowing as defined in the [Whistleblower] Act," *id.* at 274.  In reaching this conclusion, Judge Lynch undertook a comprehensive examination of the statute's plain meaning, purpose, statutory scheme, legislative history, and practice commentary.  *See id.* at 262-74.  Judge Lynch noted that a narrow reading of the waiver provision would give effect to the statute's provision that it does not diminish the other legal rights and remedies of employees.  *See id.* at 269.  Furthermore, Judge Lynch reasoned that the statute's purpose of protecting and encouraging the disclosure of certain unlawful employer practices would not be served by forcing employees to select between pursuing a Section 740 claim or pursuing other legal rights unrelated to the employee's whistleblowing activity.  *See id.* at 270-72.  Importantly, Judge Lynch also noted that construing the act to require a plaintiff to waive "arguably unrelated federal rights" as a condition

_____

[2] Defendant also cites *Beers v. Kaiser Permanente Northeast Division*, No. 98-CV-1121, 1999 WL 1269419 (N.D.N.Y. Dec. 16, 1999) for the proposition that the Section 740 waiver applies to all causes of action including federal causes of action.  However, in that case, Judge McAvoy did not reach the question of whether the plaintiff's institution of a Section 740 claim waived the plaintiff's claim of retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII").  Rather, Judge McAvoy dismissed the plaintiff's Title VII claim on its merits.  *See* 1999 WL 1269419 at *2-3.  Judge McAvoy did dismiss the plaintiff's claim under New York Executive Law § 290, which was based on the defendants' alleged retaliation against the plaintiff for the same reporting activities underlying the plaintiff's Section 740 claim, as waived.  *See id.* at *5.  Accordingly, the Court agrees with Plaintiff that *Beers* cannot be read as broadly as Defendant suggests and does not support the proposition that a federally protected right can be waived by initiating a Section 740 claim.

10

of pursuing a state law right "would raise serious constitutional questions." *Id.* at 265. Therefore, Judge Lynch concluded, "the policy of constitutional avoidance weighs heavily in favor of seeking sensible alternatives to any construction of the Act which would require automatic waiver of the plaintiff's federal rights." *Id.* at 267.

A number of courts within this circuit have agreed and adopted the *Collette* analysis to conclude that initiating a Section 740 claim "waives only 'other legal rights and remedies that protect against the same *wrong* that the statute itself prohibits.'" *Barker v. Peconic Landing at Southold, Inc.*, 885 F. Supp. 2d 564, 569 (E.D.N.Y. 2012) (quoting *Collette*, 132 F. Supp. 2d at 267); *see also, e.g.*, *Kapner v. Riverwise Wine & Liquor, Inc.*, No. 09-CV-6565, 2011 WL 5154608, *5-6 (W.D.N.Y. Oct. 28, 2011); *Slay v. Target Corp.*, No. 11 Civ. 2704, 2011 WL 3278918, *3 (S.D.N.Y. July 20, 2011); *Kramsky v. Chetrit Grp., LLC*, No. 10 CV 2638, 2010 WL 4628299, *5 (S.D.N.Y. Nov. 16, 2010). This Court joins those courts in adopting the *Collette* narrow definition of the Section 740 waiver.[3] The Court therefore turns to consideration of whether any of Plaintiff's claims are waived under this narrow approach.

Under the *Collette* court's waiver approach, the question is whether Plaintiff's additional claims protect against the same wrong that is prohibited by the Whistleblower Statute — namely, "protecting the rights of employees who report violations of law that present a danger to public health or safety." *Barker*, 885 F. Supp. 2d at 569. Plaintiff's first two causes of action assert rights under the FMLA, which exists "to entitle employees to take reasonable leave for medical reasons . . . in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(2)-(3). Plaintiff's third cause of action is based on Defendant's alleged intentional

---

[3] The Court notes that certification of the question of the proper scope of the Section 740 waiver to the New York Court of Appeals from the Second Circuit could resolve the uncertainty surrounding the exact parameters of the waiver perplexing the lower state and federal courts.

infliction of emotional distress on Plaintiff. Plainly, none of Plaintiff's additional claims involve the same wrongs that Section 740 prohibits, as none are related to Plaintiff's reporting of Defendant's alleged violations of law. Accordingly, Plaintiff's FMLA and intentional infliction of emotional distress claims are not waived by his filing of a Section 740 claim. The Court will now turn to whether Plaintiff's amended complaint states cognizable claims.

## C. Interference with Plaintiff's Rights Under the FMLA

Under the FMLA, it is unlawful for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). In order to state a claim of interference under the FMLA,

> a plaintiff must establish that: "(1) [s]he is an eligible employee under the FMLA, as defined in 29 U.S.C. § 2611(2); (2) the defendant is an employer under the FMLA, as defined in 29 U.S.C. § 2611(4); (3)[s]he was entitled to take leave under the FMLA, as defined in 29 U.S.C. § 2612(a)(1); (4)[s]he gave notice to the defendant of [her] intention to take leave, as defined in 29 U.S.C. § 2612(e)(1) and 29 C.F.R. §§ 825.302–.303; and (5) the defendant denied [her] the benefits to which [s]he was entitled under the FMLA."

*Bond v. Sterling, Inc.*, 77 F. Supp. 2d 300, 306 (N.D.N.Y. 1999) (quoting *Belgrave v. City of New York*, No. 95-CV-1507, 1999 WL 692034, *43 (E.D.N.Y. Aug. 31, 1999)). Defendant does not dispute that Plaintiff was an eligible employee and Defendant an employer as defined by the FMLA. *See* Dkt. No. 20 at 8. Defendant argues that Plaintiff has not stated a claim of interference because he has not pled facts establishing his entitlement to leave under the FMLA or his provision of proper notice to Defendant of his intention to take FMLA leave. *See* Dkt. No. 17-2 at 13-23.

### 1. Entitlement to FMLA Leave

In order to be entitled to personal medical FMLA leave, an eligible employee must have "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The term "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Here, Plaintiff's claim of entitlement to FMLA leave centers on a serious health condition involving continuing treatment by a health care provider.

Pursuant to regulations issued by the Department of Labor, a serious health condition involving continuing treatment by a health care provider includes a

> [a] period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves
>
> > (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
> >
> > (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.
> >
> > (3) The requirement in paragraphs (a)(1) and (2) of this section for treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.
> >
> > (4) Whether additional treatment visits or a regimen of continuing treatment is necessary within the 30–day period shall be determined by the health care provider.

29 C.F.R. § 825.115(a)(1)-(4). The term "incapacity" is defined as "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b). The term "treatment" "includes (but

13

is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition." *Id.* § 825.113(c). A "regimen of continuing treatment" includes a course of prescription medicine, while "the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider[] is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave." *Id.*

Defendant argues that Plaintiff cannot establish that he received continuing treatment from a health care provider sufficient to satisfy the definition set forth at 29 C.F.R. § 825.115. Specifically, Defendant contends that Plaintiff cannot demonstrate that he received "treatment two or more times, within 30 days of the first day of incapacity." Dkt. No. 17-2 at 15 (quoting 29 C.F.R. § 825.115(a)(1)). Defendant argues that the first day of Plaintiff's incapacity was October 16, 2013, the date of Plaintiff's first visit to Norton and Norton's initial diagnosis of anxiety. *See id.* at 15-16. As Plaintiff's next visit to Norton occurred on November 21, 2013, more than thirty days after the first day of Plaintiff's incapacity, Defendant argues that the requirements of the regulation are not met. *See id.*

However, Plaintiff argues that the period of incapacity that started on October 16, 2013 ended when Plaintiff returned to work on October 22, 2013. *See* Dkt. No. 19-1 at 15. Plaintiff further argues that the period of incapacity underlying his FMLA claim began on November 21, 2013, when Plaintiff learned that Gilligan would return to work. *See id.* at 15-16. Plaintiff contends that his visits to Norton on November 21, 2013 and December 10, 2013 therefore satisfy the regulation's requirement that treatment occur at least twice within thirty days of the first day of incapacity. *See id.* Defendant disagrees that Plaintiff's return to work ended the period of incapacity beginning on October 16, 2013 and argues that because Plaintiff's November medical

visit and work absence were related to the same condition as the October visit and absence —

anxiety — they were a continuation of the same period of incapacity. *See* Dkt. 17-2 at 15-16.

The Court agrees with Plaintiff's position. Neither party provided the Court with case law

or other legal support for their respective positions, and the Court has found none that directly

addresses the issue. However, for purposes of the FMLA, "incapacity" is defined by the

"inability to work . . . or perform other regular daily activities." 29 C.F.R. § 825.113(b). Thus,

when Plaintiff was capable of and did return to work on October 22, 2013, he no longer met the

FMLA definition of incapacity. Plaintiff's allegations make clear that he was capable of working

and did work for the period from October 22, 2013 through November 20, 2013. Treating the

period beginning October 16, 2013 and the period beginning November 21, 2013, when Plaintiff's

anxiety-related symptoms renewed, as one ongoing period of incapacity would therefore be

nonsensical, as Plaintiff did not qualify as incapacitated for nearly one month of that time period.

Accordingly, the Court finds that Plaintiff has sufficiently alleged entitlement to FMLA leave

based on a serious health condition involving continuing treatment by a health care provider by

alleging that he was treated by Norton twice within thirty days of the first day of his incapacity on

November 21, 2013.[4]

---

[4] Defendant's repeated assertions that Plaintiff's amending his complaint to include the
December 10, 2013 appointment was somehow improper are without merit. *See* Dkt. No. 17-2 at
15-16 ("By virtue of Von Roll's initial motion to dismiss, Plaintiff is well aware that the sworn
allegations contained in his initial Complaint fail to establish that he received treatment two or
more times within 30 days of the first day of incapacity. Thus, he now claims in his Amended
Complaint that the operative dates are November 21, 2013 and December [10], 2013, since they
were within thirty days of one another. . . . Plaintiff cannot be allowed to change his sworn
statements in order to overcome a motion to dismiss."); Dkt. No. 20 at 10 ("[A]fter the
inadequacy of Plaintiff's claims were pointed out by Von Roll's initial Motion to Dismiss the
Verified Complaint, Plaintiff amended his allegation by adding a medical appointment which was
strangely missing from his initial pleading . . . ." (footnote and internal citation omitted)).
Plaintiff properly amended his complaint pursuant to Rule 15 of the Federal Rules of Civil

(continued...)

Alternatively, Plaintiff contends that his allegations establish his entitlement to FMLA leave because he "obtained treatment 'on at least one occasion, which result[ed] in a regimen of continuing treatment under the supervision of the health care provider.'" Dkt. No. 19-1 at 16 (internal citation omitted) (quoting 29 C.F.R. § 825.115(a)(2)). Specifically, Plaintiff contends that the anti-anxiety medication prescribed by Norton on November 21, 2013 qualifies as a regimen of continuing treatment under the supervision of a health care provider, which the regulations define to include a "course of prescription medication." *See id.*; 29 C.F.R. § 825.113(c).

Defendant first argues that to the extent Norton's prescription of anti-anxiety medication qualifies as a regimen of continuing treatment, Plaintiff has nonetheless failed to establish continuing treatment as defined by the regulations because Norton did not determine that the regimen of continuing treatment was necessary within thirty days of the first day of incapacity as required by 29 C.F.R. § 825.115(a)(4). *See* Dkt. No. 17-2 at 17-18. This argument rests on Defendant's contention that the first day of Plaintiff's incapacity was October 16, 2013, which the Court rejected above. As Norton prescribed the anti-anxiety prescription regimen to Plaintiff on November 21, 2013, the first day of Plaintiff's incapacity, Defendant's argument is unavailing.

Defendant next argues that the prescription does not qualify as a regimen of continuing treatment under the supervision of a health care provider because Plaintiff was prescribed the anti-anxiety medication *pro re nata* ("PRN"), or "as needed" as determined by the patient. Dkt.

---

[4](...continued)
Procedure in an attempt to cure the legal deficiencies identified in Defendant's first motion to dismiss. Amendments to pleadings are permitted for just this purpose, and Defendant's bald assertions that Plaintiff's amended allegations are untrue provide the Court no basis for rejecting the allegations, which the Court must presume true for purposes of this motion. *See ATSI Commc'ns,* 493 F.3d at 98.

No. 17-2 at 18-19; *see also* Dkt. No. 12-1 at 4 (indicating that Plaintiff's anti-anxiety medication was prescribed PRN); *Lily v. Comm'r of Soc. Sec.*, No. 00-CV-6565, 2001 WL 1822680, *3 n.4 (W.D.N.Y. Dec. 27, 2001) (defining PRN). Defendant argues that medicine prescribed PRN cannot qualify as a regimen of treatment under the supervision of a health care provider because when and whether to take the prescribed medication is determined by the patient, not the health care provider. *See* Dkt. No. 17-2 at 19. In response, Plaintiff argues that because the regulations specify that activities that "can be initiated without a visit to a health care provider" do not qualify as a regimen of continuing treatment, a PRN prescription that could not be initiated without a visit to a health care provider does qualify as such a regimen. *See* Dkt. No. 19-1 at 17-18.

The Eighth Circuit recently considered a similar line of argument in *Johnson v. Wheeling Machine Products*, 779 F.3d 514 (8th Cir. 2015). There, the plaintiff alleged that he was eligible for FMLA leave based on a serious health condition requiring continuing treatment because he was treated once for high blood pressure and received prescription medication as a result of that single treatment. *See Johnson*, 779 F.3d at 519-20. The Eighth Circuit concluded that in order to give the supervision requirement of 29 C.F.R. § 825.115 effect, a regimen of prescription medicine qualifies as continuing treatment only if some level of supervision by a health care provider is involved in the regimen. *Id.* at 520. By way of example, the court suggested that "a phone call with the health care provider to communicate updates on the patient's condition and progress" or "a follow-up appointment soon after the first visit" to evaluate the effectiveness of the prescription regimen would be sufficient. *Id.* Thus, the court concluded that because the plaintiff's doctor "did not oversee, watch, or direct any part of [the plaintiff's] treatment regimen; he simply prescribed [the plaintiff] medication and sent him on his way," the plaintiff did not

undergo a regimen of continuing treatment under the supervision of the health care provider. *Id.* at 520-21.

Here, Plaintiff has alleged that after Norton prescribed Plaintiff anti-anxiety medication on November 21, 2013, he scheduled a follow-up appointment with Plaintiff for December 5, 2013. *See* Dkt. No. 12 at ¶ 34. Furthermore, Plaintiff did in fact see Norton for a follow-up visit on December 10, 2013, at which time Norton prescribed a different anxi-anxiety medication for Plaintiff. *See id.* at ¶ 36. Drawing all reasonable inferences in Plaintiff's favor, Plaintiff has sufficiently established that notwithstanding the fact that his anti-anxiety medication was prescribed PRN, Plaintiff's prescription medication regimen was administered under the supervision of a health care provider. Therefore, Plaintiff has sufficiently alleged entitlement to FMLA leave based on at least one instance of treatment resulting in a regimen of continuing treatment under the supervision of a health care provider.

Defendant also argues that even if Plaintiff has alleged a serious health condition, he cannot establish eligibility for FMLA leave because his inability to work was not "***due to*** the serious health condition, treatment therefore, or recovery therefrom." Dkt. No. 17-2 at 20 (quoting 29 C.F.R. § 825.113(b)). Defendant contends that Norton's statements on the Short Term Disability Form that Plaintiff needed to remain "[o]ut of work while current situation with coworker mediated" and "cannot work under current duress until situation mediated, harassment occurring by coworker" indicate that Plaintiff's inability to work was caused by a dispute with a co-worker rather than a medical condition. *Id.* (quoting Dkt. No. 12-1 at 4-5). However, Norton diagnosed Plaintiff with work-related anxiety and instructed Plaintiff to remain out of work because of his anxiety. *See* Dkt. No. 12 at ¶ 33; Dkt. No. 12-1 at 4. Read in context, the statements quoted by Defendant simply demonstrate that the source of Plaintiff's anxiety —

which Defendant does not dispute can qualify as a serious health condition — was the situation between Plaintiff and Gilligan. Plaintiff's allegations that his inability to work was caused by a serious health condition are sufficiently pled.[5]

### 2. Notice

Defendant additionally contends that Plaintiff's FMLA interference claim fails because Plaintiff did not provide Defendant adequate notice of his need for FMLA leave. An employee requesting FMLA leave must provide an employer at least thirty days advance notice if the need for the leave is foreseeable, or, if thirty days notice is not practicable, as soon as possible and practicable, taking into account all of the facts and circumstances of the individual case. 29 C.F.R. § 825.302(a)-(b). If the need for leave is not foreseeable, the employee must provide "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b). "When an employee seeks leave for the first time for a FMLA–qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." *Id.* "The employer will be expected to obtain any additional required information through informal means." *Id.* However, "[c]alling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act." *Id.*

"[I]n assessing notice under the FMLA, '[t]he critical question is whether information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'" *Golden v. N.Y. City Dep't of Envtl. Prot.*, No. 06 CIV.

---

[5] Defendant's arguments concerning Plaintiff's alleged attempt "to invoke the FMLA in order to avoid an undesirable workplace situation," Dkt. No. 17-2 at 25, are similarly without merit, as they ignore Plaintiff's anxiety diagnosis and Norton's recommendation that Plaintiff remain out of work because of his anxiety.

1587, 2007 WL 2319130, *4 (S.D.N.Y. Aug. 10, 2007) (quoting *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005)). "[T]he employer's duties [to collect information] are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Nally v. New York*, No. 1:10-CV-1186, 2013 WL 2384252, *13 (N.D.N.Y. May 30, 2013) (quoting *Kobus v. Coll. of St. Scholastica, Inc.*, 608 F.3d 1034, 1036-37 (8th Cir. 2010)).

Here, Defendant focuses on the Short Term Disability Form it received from Plaintiff on November 22, contending that the information provided in the form "did not include any information concerning a health condition, let alone information indicating he might require in-patient treatment, continuing medical treatment, or even suffer from a serious health condition that might entitle him to FMLA leave." Dkt. No. 17-2 at 22. Defendant's argument fails for two reasons. First, contrary to Defendant's assertions, the Short Term Disability Form indicates that Plaintiff was diagnosed with anxiety and would require further treatment in the form of an anti-anxiety medication prescription and a second office visit. *See* Dkt. No. 12-1 at 4. Second, in addition to submitting the Short Term Disability Form, Plaintiff also alleges that he (1) spoke to a human resources representative regarding his eligibility for FMLA leave on November 21 and (2) called into work each day of his absence from November 25 through December 12, specifically referencing his anxiety and stress. *See* Dkt. No. 12 at ¶¶ 32, 35. Taken together, these communications were sufficient to apprise Defendant that Plaintiff was requesting time off for a serious health condition.[6]

Finally, Defendant does not dispute that it denied Plaintiff FMLA leave. As Plaintiff has sufficiently pled each element of an interference claim under the FMLA, Defendant's motion to

---

[6] Defendant does not contest that Plaintiff's notice was timely.

dismiss Plaintiff's first cause of action is denied.

**D.     Retaliation in Violation of the FMLA**

In order to make out a prima facie case for retaliation for exercising rights under the FMLA, an employee "must establish that: 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).  Defendant does not dispute that Plaintiff's allegations establish that Plaintiff was qualified for his position and suffered an adverse employment action that occurred under circumstances giving rise to an inference of retaliatory intent.  Defendant argues solely that Plaintiff has not established that he exercised rights protected under the FMLA.  *See* Dkt. No. 17-2 at 23-25; Dkt. No. 20 at 12.  Defendant's argument rests on the premise that Plaintiff has not established entitlement to FMLA leave.  *See* Dkt. No. 17-2 at 24-25 ("[W]ithout any entitlement to FMLA benefits, Plaintiff cannot exercise rights protected under the FMLA and therefore cannot state a claim for retaliation under the FMLA.").  As the Court has already determined that Plaintiff's allegations suffice to establish his entitlement to FMLA leave, Defendant's motion to dismiss Plaintiff's FMLA retaliation claim is denied.

**E.     Intentional Infliction of Emotional Distress**

In order to state a claim for intentional infliction of emotional distress under New York law, a plaintiff must plead: "(1) extreme and outrageous conduct, measured by the reasonable bounds of decency tolerated by society; (2) intent to cause or disregard of a substantial probability of causing severe emotional distress; '(3) a causal connection between the conduct and the injury; and (4) severe emotional distress.'"  *Margrabe v. Sexter & Warmflash, P.C.*, 353 Fed. Appx. 547, 550 (2d Cir. 2009) (quoting *Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001)); *see also*

*Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993). New York law sets a very high threshold for extreme and outrageous conduct. "The conduct at issue 'must transcend the bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community.'" *Margrabe*, 353 Fed. Appx. at 550 (quoting *Klinge v. Ithaca Coll.*, 235 A.D.2d 724, 727 (3d Dep't 1997)). To survive a motion to dismiss, "[t]he conduct alleged must be such that it can be fairly characterized as egregious, utterly despicable, heartless or flagrant." *Lydeatte v. Bronx Overall Econ. Dev. Corp.*, No. 00CIV5433, 2001 WL 180055, *2 (S.D.N.Y. February 22, 2001). A claim for the intentional infliction of emotion distress is "rigorous, and difficult to satisfy." *Howell*, 81 N.Y.2d at 122 (quotation omitted). Whether the alleged conduct "may reasonably be regarded as so extreme and outrageous as to permit recovery" is a matter of law for the court to determine in the first instance. *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (citations omitted).

Plaintiff's amended complaint appears to allege two different theories of intentional infliction of emotional distress: (1) that Defendant is liable for Gilligan's extreme and outrageous conduct, *see* Dkt. No. 12 at ¶¶ 65-66; and (2) that Defendant's own conduct of rehiring Gilligan, terminating Plaintiff, and challenging Plaintiff's application for unemployment benefits was extreme and outrageous, *see id.* at ¶¶ 67-72. In his opposition to Defendant's motion to dismiss, however, Plaintiff argues only that Defendant is liable for Gilligan's tortious conduct. *See* Dkt. No. 19-1 at 24-25. As Defendant correctly asserts, the New York Court of Appeals has rejected the availability of an intentional infliction of emotional distress claim as a means of challenging an abusive or wrongful termination of an at-will employee. *See Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983). Furthermore, the Court agrees with Defendant that Defendant's exercising its statutory right to oppose and appeal unemployment insurance benefits plainly cannot be described as extreme and outrageous. In addition, Defendant's rehiring of

Gilligan cannot be said to be "atrocious and utterly intolerable in a civilized community." *Margrabe*, 353 Fed. Appx. at 550. The Court therefore finds that none of Defendant's own conduct can support a claim for intentional infliction of emotional distress.

As to Defendant's liability for Gilligan's alleged harassment and threats against Plaintiff, under New York law, an employer "can be held vicariously liable for [an employee's] tortious actions . . . only if he committed them in furtherance of [the employer's] business and within the scope of his employment." *Gray v. Schenectady City Sch. Dist.*, 86 A.D.3d 771, 773 (3rd Dep't 2011) (citation omitted). Here, although Plaintiff argues that certain factors suggest that when harassing Plaintiff, Gilligan was acting within the scope of his employment, Plaintiff makes no argument that Gilligan was also acting in furtherance of Defendant's business. *See* Dkt. No. 19-1 at 24-25. Nor does the amended complaint contain any factual allegations that "connect [Gilligan's] actions to defendant's business purposes, as opposed to him acting solely for personal reasons." *Gray*, 86 A.D.3d at 773. Gilligan's threats against coworkers, destruction of Defendant's property in the form of Plaintiff's work chair, and display of violent images and ammunition are in no way linked to Defendant's business purposes. Accordingly, Plaintiff's allegations are insufficient to hold Defendant vicariously liable for Gilligan's alleged extreme and outrageous conduct.

Furthermore, an employer's "mere inaction after receiving complaints about [the employee's] behavior—which allegedly allowed him to continue to engage in this behavior in spite of the notice regarding his actions—cannot be considered the type of extreme and outrageous conduct that is 'utterly intolerable in a civilized community.'" *Id.* (quoting *Murphy*, 58 N.Y.2d at 303); *see also Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 492 (S.D.N.Y. 1999) ("[E]ven if [the employer] failed to adequately respond to [the plaintiff's] reports of

harassment and discharged her based on a retaliatory motive, such action is not sufficient to meet the high threshold of extreme and outrageous conduct set by New York courts.").  Although Plaintiff claims that this is an "exceptional case" of failure to take corrective measures, Dkt. No. 19-1 at 25, Plaintiff's allegations are factually indistinguishable from the theories of employer inaction rejected in *Gray* and *Sowemimo*, *see Sowemimo*, 43 F. Supp. 2d at 482 (alleging that employer ignored reports of repeated sexual harassment, including groping, by coworker); *Gray*, 86 A.D.3d at 773 (alleging that employer's inaction after receiving complaints about coworker's harassment, intimidation, and vandalism directed at plaintiffs allowed coworker to continue to engage in harassing behavior).

As Plaintiff does not allege extreme and outrageous conduct by Defendant sufficient to sustain a claim for intentional infliction of emotional distress, Defendant's motion to dismiss Plaintiff's third cause of action is granted.

**F.     Retaliation in Violation of New York Labor Law § 740**

New York's Whistleblower Act provides in relevant part that

> [a]n employer shall not take any retaliatory personnel action against an employee because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety.

N.Y. Lab. Law. § 740(2).  Thus, in order to state a cause of action for retaliation under § 740,

> a plaintiff must allege facts supporting the conclusion that (1) he was subject to a retaliatory personnel action after (2) disclosing to a supervisor [or public body] (3) a practice of the employer that is in violation of a law, rule, or regulation (4) that creates and presents a substantial and specific danger to the public health or safety.

*Clarke v. TRW, Inc.*, 921 F. Supp. 927, 933 (N.D.N.Y. 1996).

"Section 740 'is triggered only by a violation of a law, rule or regulation that creates and

presents a substantial and specific danger to the public health and safety.'" *Calabro v. Nassau Univ. Med. Ctr.*, 424 F. Supp. 2d 465, 475 (E.D.N.Y. 2006). "The provisions of [Section 740] regarding retaliatory discharge are to be strictly construed." *Cotrone v. Consol. Edison Co. of N.Y., Inc.*, 50 A.D.3d 354, 354 (1st Dep't 2008). The statute "clearly envisions a certain quantum of dangerous activity before its remedies are implicated." *Peace v. KRNH, Inc.*, 12 A.D.3d 914, 915 (3rd Dep't 2004). Furthermore, "[t]he violation must be an actual violation, and an employee's good faith, reasonable belief that a violation occurred is insufficient." *Calabro*, 424 F. Supp. 2d at 475 (citing *Nadkarni v. North Shore-Long Island Jewish Health Sys.*, 21 A.D.3d 354, 355 (2d Dep't 2005)).

Here, Plaintiff alleges that he was terminated in retaliation for reporting Gilligan's criminal mischief and unlawful harassment to his supervisors and human resources department and to the Rotterdam Police Department. *See* Dkt. No. 12 at ¶¶ 78-85. However, although Plaintiff contends that Gilligan violated various New York penal laws, Plaintiff's complaint does not identify a single law, rule, or regulation allegedly violated by Defendant, as required by Section 740. *See* N.Y. Lab. Law § 740(2) (prohibiting retaliation by an employer where an employee reports "an activity, policy or practice *of the employer* that is in violation of law, rule or regulation" (emphasis added)).

Furthermore, Plaintiff's contention that Gilligan's conduct "created a substantial and specific danger to the public health and safety, to wit, the danger of a mass shooting at Von Roll," Dkt. No. 12 at ¶ 84, is the type of "mere speculation" that is insufficient to support a Section 740 claim, *Cotrone*, 50 A.D.3d at 355. Despite Plaintiff's claim that Gilligan exhibited "escalating threatening behavior" that made the danger of a mass shooting "not speculative," Dkt. No. 12 at ¶ 84, Plaintiff's allegations indicate only that Gilligan made verbal threats to coworkers and

displayed inappropriate images and ammunition on his desk. Gilligan's conduct, while inappropriate and harassing to his coworkers, simply did not rise to the level of danger to public health and safety required by the statute. *Compare Cotrone*, 50 A.D.3d at 354-55 (concluding that leaving tanker trucks with hazardous materials unattended on a public street did not create a substantial and specific danger to the public health or safety) and *Peace*, 12 A.D.3d at 915-16 (finding allegations that a respiratory therapist documented false respiratory treatment and blood-oxygen level checks that had not in fact been performed "simply insufficient to establish the requisite threat to public health and safety") with *Villarin v. Rabbi Haskel Lookstein Sch.*, 96 A.D.3d 1, 5-6 (1st Dep't 2012) (concluding that school's alleged policy of refusing to report incidences of child abuse presented a substantial danger to the public health or safety) and *Meaney v. Village of Johnson City*, No. 3:10-CV-00070, 2010 WL 1633371, *7 (N.D.N.Y. Apr. 21, 2010) (finding that a village's reduction of the minimum required persons per shift for its fire department below requisite shift staffing standards presented a substantial and specific danger to the public).

Accordingly, Defendant's motion to dismiss Plaintiff's Section 740 retaliation claim is granted.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion to dismiss is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that Plaintiff's intentional infliction of emotional distress and New York Labor Law § 740 claims are **DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.[7]

**IT IS SO ORDERED.**

Dated: August 25, 2015
Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[7] As a result of this Memorandum-Decision and Order, Plaintiff's remaining claims are his FMLA interference and retaliation claims.